## Kemerer *v.* Johnstown Bank and Trust Company, Administrator, Appellant.

Argued April 17, 1935.

Before KELLER, P. J., CUNNINGHAM, BALDRIGE, STADT-
FELD, PARKER, JAMES and RHODES, JJ.

*Morton Meyers,* of *Graham, Yost & Meyers,* for appel-
lant.

*Alvin Sherbine,* for appellee.

OPINION BY CUNNINGHAM, J., December 18, 1935:

This was an action for wages for services allegedly
rendered by plaintiff to one Peter Vogel during the
later years of his life. The suit was against his estate.
It was averred that the plaintiff acted as housekeeper
and cook at a hotel kept by the decedent, and continued
in that employment until his death; that the decedent
had orally contracted to pay plaintiff the sum of $12.50

a week for her services; but that he had failed to pay her any wages from November 1, 1930, up until the date of his death—March 4, 1933. The defense was, first, a flat denial that decedent had ever entered into the contract declared upon; and second, an averment that plaintiff had done no work for him during the period specified, by reason of her physical incapacity to perform any household duties.

At the trial, plaintiff produced three witnesses, who testified that decedent had many times acknowledged both the contract and his indebtedness to the plaintiff, and who also described the nature of the services she performed. Decedent's personal representative, on the other hand, produced witnesses whose testimony was to the effect that plaintiff was bedridden through much of the period in question, and that decedent was obliged to cook his own meals and do his own housework. The case was submitted to the jury in a careful charge, which emphasized the burden of proof to be borne by a plaintiff in a suit to recover wages against the estate of a decedent. A verdict was rendered in favor of the plaintiff in the sum demanded and defendant's motions for judgment n. o. v. or a new trial were denied.

The principal error assigned upon this appeal is that the court below erred in instructing the jury that the question of performance of the contract by plaintiff was not one for them to consider, except in so far as it bore upon the existence or nonexistence of the contract. This assignment is based upon the following excerpt from the charge:

"There is another matter which we are obliged to call to your attention, and that is that wages for domestic service are presumed to be paid at the periods customary for payment, and while there is evidence before you, which, if believed, would overcome that presumption, namely, the statements made by decedent that he could not get money to pay plaintiff, yet that pre-

sumption is to be overcome by sufficient testimony, that is, the presumption of payment. The defense here, however, is not payment. It is defendant's contention there was no contract at all. Defendant could not claim payment, as that would be an acknowledgment of the contract, and likewise *a claim of nonperformance would be acknowledging the contract.* However, you should take into account, as we have said, the presumption of payment for all services rendered, *but not take into account the question of performance as affecting the right to recover, excepting as it bears upon the existence or nonexistence of this express contract.* The testimony as to the inability of the plaintiff to do her work *relates not to performance, but relates, as heretofore stated, to the likelihood of a contract being made with one in her physical condition,* and goes indirectly only to prove that no such contract existed, and affects particularly the credibility of plaintiff's witnesses." (Italics supplied)

The previous statement referred to reads: "So we want you to distinguish between the evidence as to the existence of the contract and this evidence of the physical inability of the plaintiff to perform services under such a contract, which is not a direct but an indirect attack upon it, because of the improbability or unlikelihood of such a contract under circumstances as affected largely by her physical condition."

As a general proposition, defendant is correct in his contention that a claim of nonperformance does not necessarily admit the contract. An executor, in the normal instance—or any other defendant, for that matter—may plead that no contract was entered into, but that even if a contract did exist the plaintiff had not performed his part. Thus, if the contract in this case had been one to build a house for the decedent, the executor, if the facts warranted, might have defended upon the theory that decedent had not entered into such

an agreement, and that in any event no house had been built. To this extent, the court below was technically in error in making the general statement that "a claim of nonperformance would be acknowledging the contract," and in instructing the jury that it should "not take into account the question of performance as affecting the right to recover, excepting as it bears upon the existence or nonexistence of this express contract."

Granting that the portion of the charge complained of was erroneous as applied to an abstract question of pleading, we are not convinced that it was error when applied to the particular facts and circumstances of the concrete case on trial, and especially when read in the light of the charge as a whole. Plaintiff, as above stated, undertook to establish the contract by statements of witnesses as to declarations by the decedent. The testimony of Elsie Miller is a fair example. "Q. Will you state during these frequent conversations if Peter Vogel stated at the time that he was indebted to Daisy Kemerer in any sum of money? A. Yes, he did. Q. Will you state whether or not he told you how much he was paying or had agreed to pay Daisy Kemerer for her services? A. Twelve dollars and a half a week. ...... Q. State whether or not he told you for how long a period of time he owed Daisy Kemerer the sum of $12.50 a week? A. From about November, 1930. He told me his business was so bad he didn't take in any money; he didn't pay her as money was tied up, and he couldn't get any money to pay her. ...... Q. At the time he told you he couldn't pay her, did he say anything about the terms of the contract? A. He said he had agreed to pay her $12.50 a week. Q. Was that at the same time he said he couldn't pay her? A. Yes. Q. Was that part of the conversation? A. Yes, sir. Q. Then, I understand, you continued to visit the Vogel home and saw your sister from that on until approximately the date of the

death of Mr. Vogel? A. Up until right before he died. Q. I believe you testified as to the death—you were there preceding his death? A. It was about three weeks. Q. From the time in November, when he mentioned this matter to you, up until the time you were there about three weeks prior to his death, will you state whether or not he made any further reference as to his obligation to Daisy, and whether or not he had paid her? A. He told me he hadn't paid her, that he couldn't pay her. Q. About how often did he tell you or make these statements to you from November, 1930, up until the last time you saw Peter Vogel? A. I judge it would be thirty times anyhow that I visited there. Q. Did he seem to be worried about this obligation? A. He was worried about his obligations. Q. Will you please state whether or not in that conversation he mentioned from any time or how long a period of time he had been unable to pay Daisy Kemerer? A. He told me from the month of November in 1930 that he hadn't paid her."

Cecelia Collins testified that she had talked to the decedent on numerous occasions upon which he referred to his indebtedness to the plaintiff and said he could not obtain the money to pay her wages. The last of these conversations was about three weeks prior to his death.

Mary Willey also visited decedent's hotel, according to her testimony, almost every week during the summer and upon other occasions; she further testified that decedent was continually complaining about his finances and stated he owed plaintiff money but was unable to pay her. The last of these conversations took place between Christmas 1932 and the time of decedent's death.

All of these witnesses testified that plaintiff had worked for decedent on and off for a period of about twenty-seven years, as his housekeeper; that she had

left his employ for about five years in 1921, but subsequently returned and remained with him up to his death. While they admitted that during the last years of his life she was not in the best of health, they were emphatic in stating that she did perform such services as were necessary and that decedent had said he could not get along without her.

If this testimony is to be believed, we think the element of performance was not one for the jury to consider. It was given full leeway to consider plaintiff's physical condition in so far as it might relate to the improbability of the existence of the contract and the credibility of those witnesses for plaintiff who testified as to the numerous declarations by the decedent. The verdict shows it believed the contract was made, and this necessarily includes a finding that decedent had in fact made the declarations.

These declarations had a twofold significance. They not only established the bare existence of a contract, but also that decedent was satisfied with the services rendered under it up to the time the declarations were made. The situation is not one where the testimony merely established an oral contract some years before the death of decedent, but did not indicate the character of performance after that date. On the contrary, the testimony is definitely to the effect that decedent freely acknowledged the existence of the contract and his liability to pay according to its terms up to a point of time within a few weeks of his death. It also was unchallenged that there was no substantial change in plaintiff's physical condition or in the nature of the services which she rendered during these last few weeks. This being the case, decedent himself by making the declarations expressed satisfaction with the performance given by plaintiff, whatever the extent of that performance may have been.

Necessarily, the nature of the services to be rendered

by the plaintiff was vague and indefinite. The testimony establishes that decedent lived by himself, and during the last few years of his life did little or no business. He was bound to plaintiff by long years of association. It may be that toward the end of his life plaintiff was unable to perform in full those services which another master might have required. However, the extent of the services to be rendered in exchange for his promise to pay $12.50 a week was a question for decedent alone to decide. It was entirely his business to determine whether he was obtaining what he wanted from the plaintiff, or even to waive any deficiencies in performance. It is, of course, elementary that a master may waive nonperformance, and that continuance by him of an employee in his service, with knowledge of a breach of the employment contract, constitutes a waiver: 39 C. J. 169. Thus, an employee may recover wages, when he is retained in his employment, although he is lazy (Hobbs v. Riddick, 50 N. C. 80), or incompetent (Ferry v. Henderson, 32 App. (D. C.) 41), or even unfaithful to his trust (Kirk v. Hodgson, 3 Johns. Ch. 400). Here, decedent not only continually acknowledged and reaffirmed the contract, but evidenced a clear purpose to see that it would be fulfilled on his part and actual disappointment at his inability to obtain funds.

The court below was careful to review the basically conflicting testimony, and to impress upon the jury the heavy burden of proof to be met by the plaintiff. The real issue in the case was whether or not decedent considered the plaintiff his cook and housekeeper. If defendant's witnesses were to be believed, plaintiff was incapable of performing any work and was the mere object of decedent's charity, with the result that he was under no obligation to her whatsoever. The jury chose to ignore this testimony, and to find that a contract had been made and was in existence. Under the

circumstances disclosed by the evidence, and in view of decedent's repeated declarations up to the date of his death, it would be neither proper nor just to ignore the decedent's test of performance and substitute such test as a jury might adopt. We are satisfied, therefore, that while the language assigned as error was too broad when considered as a general statement of the law, it was not prejudicial to the estate when applied to the facts of this particular case.

We may also note that counsel for the estate seem to have been satisfied with the instruction when given. In reply to the inquiry of the trial judge at the conclusion of the charge as to whether he had omitted anything or "mentioned something" he "should not have," they directed attention to several other matters, said there was nothing else and took only a general exception.

The other specific assignment of error need only be noticed. It was that it was error for the court below to charge that plaintiff could recover only at the rate of $12.50 a week, or nothing. It is difficult to understand why complaint is made of this portion of the charge, because it was, if anything, beneficial to the defendant. At least one of plaintiff's witnesses had testified that the oral contract for services was at the rate of $50 a month. The court specifically instructed the jury that under the pleadings they must either find a contract for $12.50 a week, or no contract at all. The charge was obviously designed to hold plaintiff strictly to the averments in her statement of claim, and to prevent a recovery either upon any other contractual basis or upon a quantum meruit. Had such instructions not been given, defendant would have had a right to insist upon them; we fail to see how they did more than state the correct theory of the case. None of the assignments can be sustained.

Judgment affirmed.