**TAMPICO OIL AND GAS COMPANY,**
Appellant,

v.

**C'S LEASE SERVICE,** Appellee.

No. 11352.

Court of Civil Appeals of Texas.

Austin.

Jan. 12, 1966.

Austin & Dabney, Robert L. Dabney, Jr., Houston, for appellant.

Slater & Slater, E. P. Slater, Luling, for appellee.

HUGHES, Justice.

C's Lease Service, appellee, is a partnership composed of W. A. Seay, Jr. and G. B. and R. R. Seay, and is engaged in the business of servicing oil wells in Caldwell County. In the fall of 1963 appellant, Tam-

pico Oil and Gas Company, and appellee entered into an oral agreement by which appellee was to service two oil wells owned by appellant on its Bronson-Francis-Slater Unit Lease in Luling, Caldwell County, Texas, for $75.00 per month. Appellee sued appellant alleging default in payments due under this contract as well as default in the payment for extra services performed by appellee at the request of appellant. The total amount sued for was $1,489.45, plus interest and attorney's fees. Appellant answered and admitted the justness of the claim except for $442.74, as to which it denied liability. Appellant also filed a cross action for damages. The trial court, a jury being waived, denied any recovery on the cross action and rendered judgment for appellee for $1,091.34, interest, and attorney's fees of $250.00.

Neither party complains of the judgment rendered, except that appellant asserts error in not granting it recovery on its cross action, the partial effect of which would be to wipe out appellee's judgment.

The trial court has made these pertinent findings of fact:

"(1) That in late August or early September of 1963 the Plaintiff and Defendant entered into an agreement under the terms of which Plaintiffs would furnish a pumper whose duties were to gauge daily Defendant's storage tanks on its Bronson-Francis-Slater Lease in Luling, Caldwell County, Texas, and who was also to check Defendant's two wells on such lease daily to see that they were operating properly; (2) That under the terms of said agreement Plaintiffs were to make repairs of a minor nature to said wells and to notify Defendant when major repair work was necessary; (3) That under the terms of said agreement Plaintiffs were to notify the McWood Corporation, the purchaser of the crude oil produced from said lease, as to when the tank batteries were full; (4) That some of the customary duties of a pumper in the oil and gas industry are to: (a) gauge storage tanks daily; (b) maintain accurate daily gauge reports; (c) make minor mechanical repairs on lease equipment; (d) notify lease operator when major repairs are necessary; (e) notify crude oil purchaser or lease operator when storage tanks are full so that crude oil can be transported from lease by purchaser; (5) That URBAN SEAY was and has been at all times pertinent hereto an employee of Plaintiffs and the pumper who was furnished by Plaintiffs to service and Defendant's Bronson-Francis-Slater Lease wells and tank batteries; (6) That the McWood Corporation agreed to purchase all the oil produced from said lease; (7) That Plaintiffs' pumper, URBAN SEAY, or any other representative of Plaintiffs failed to be present each time when McWood Corporation would run the crude oil from said lease; (8) That URBAN SEAY nor any other employee of Plaintiffs gauged the storage tanks on such lease a number of days during the time the Plaintiffs serviced Defendant's lease; (9) That such wells on said lease did not produce for a number of days in addition to the days they were shut-in due to repairs during the time the Plaintiffs serviced such lease; (10) That said wells on said lease were shut-in for repairs about 19 days during the time the Plaintiffs serviced such lease.

\*   \*   \*   \*   \*   \*

That no act of Plaintiffs caused or contributed to the loss or reduction of oil production from Defendant's oil wells situated on the Bronson-Francis-Slater lease at Luling, Caldwell County, Texas.

\*   \*   \*   \*   \*   \*

That from August 1963 through April 1964 the Defendant's wells were not consistently producing full allowable and such facts were known to Defendants; that the Defendant did not pro-

test or indicate to Plaintiffs that the Plaintiffs' charges made to the Defendants from August 1963 to April 1964 were unsatisfactory."

The court further found that during the time appellee serviced the wells of appellant they produced 1819 barrels less than their allowable and the value of such oil not produced was $4,802.16.

Under these findings, and the undisputed evidence, it is the contention of appellant that appellee is shown to have breached its contract and that it is entitled to its damages. As to damages, there is evidence from which the trial court could have found that the two wells, if properly managed, could have produced their allowables except on days when they were shut in for repairs.

Appellant has ten points of error but we do not discuss them for the reason that it is our opinion that, under the facts and applicable law, appellant has waived its right to recover damages for appellee's failure to fully perform its contract to service these wells.

Mr. R. R. Seay testified:

"Q Now, Mr. Seay, why did you stop working for Tampico?

A We did not receive payment as we should. We had paid, the majority of our hourly rate is for labor furnished and we felt it necessary to either receive payment or stop the services.

Q Did you send or did your office send Tampico statements each month for services you had performed?

A Yes sir.

Q Were those statements ever questioned?

A No sir, not until we asked to receive payment on said balance.

Q Do you know about how long it was since they had paid when it was questioned?

A Two or three months, approximately before we received partial payment of about $500.00. Their balance was more then than what it is now and we received approximately a five hundred payment, I would say, two or three months before we stopped services."

Appellant admitted that it had not paid appellee the $75.00 monthly payment for pumping these wells for the months of 9–15–63 through 4–15–64. In addition, it admitted it had not paid appellee other charges claimed owing by appellee.

Mr. C. Anthony Buckley, president of appellant corporation, testified:

"Q Mr. Buckley, I believe you testified that there were some 56 days of no production?

A Yes, sir, * * *.

Q What did you testify as the basis on which you arrived at that conclusion? How did you determine the number of days that there was no production?

A By checking the gauge reports.

Q Whose gauge reports?

A Gauge reports prepared by Urban Seay and the other people, I don't know who they were.

* * * * * *

Q You testified that you knew these two wells were capable of producing their allowable during all that time?

A Yes sir.

Q How do you know that?

A By the production.

Q By what?

A By the production.

Q How many times were you on the lease?

A I would say six or eight times.

Q That is during this four or five or six months' time?

A Yes sir.

Q By being on the lease that number of times you could unequivocally say that those wells could produce their allowable?

A Not based on my visits to the lease, Mr. Slater, but based on my examination of the gauge reports.

Q Your gauge reports could indicate any number of things, could they not?

A The gauge reports would indicate the amount of production that was had.

Q It would indicate the amount of production was had but they indicate what the production could have been?

A I don't follow you, Mr. Slater.

Q You say by a study of your gauge reports you can say that those wells could produce 20 barrels of oil each day; is that right?

A Yes sir.

Q That is by studying your gauge reports?

A Yes sir.

Q What is it on those gauge reports that would give you that type of information?

A Production figures for various days during that period, Mr. Slater.

Q Do the wells sometimes flow in heads or produce in heads, Mr. Buckley? One day produce more oil—

A There is a variation in the production of these wells from day to day. But it should be pretty stable.

Q Mr. Buckley, did C's during all that period of time that they worked for you send the invoices each month?

A Yes, I believe so.

Q When did you first complain about their services being rendered by C's?

A I believe the first time I complained about the services being rendered was sometime in October 1963. I called Mr. Ray Seay and I told him that I was not at all satisfied with the way Urban Seay was conducting his gauging. I thought—it was my understanding that Ray Seay had agreed he was going to supervise Urban Seay's work because Urban was relatively inexperienced. That was the only basis on which we were agreeable for Urban Seay's being assigned the gauger to take care of our wells. I called Mr. Ray Seay on several different occasions and told him that the wells were not being gauged, that the reports were not being filled out properly, that there was some discrepancies in the reports and he assured me that he would take care of it.

Q You are talking about the gauges, I am talking about the work, these items that have been sued on, these seven exhibits of the plaintiff that you checked on.

A Yes sir.

Q When did you first complain about the work?

A I complained about several items, I think, back in November. I can't specifically recall which ones, Mr. Slater, but I did tell Mr. Seay that I thought they were being a little bit unreasonable.

Q But you continued to use them, did you not?

A Yes sir, Mr. Slater. We found ourselves in an unfortunate position. We were at the mercy of C's Lease Service. We were unable to find anyone else to take over this production. Mr. Seay gave me to understand in one telephone conversation that if I didn't like the way they were handling it I

knew what I could do. So we were looking for somebody to take over and we were unable to find someone until the latter part of April 1964.

\*  \*  \*  \*  \*  \*

Q Didn't you pay them for a considerable length of time without questioning those charges?

A I paid them for some of the work that was done in the early part of August and September and October, I believe. At that time most of the work that was done consisted of running rods and tubing, some of the workover units on our well, I never questioned any of those because I knew they were all right.

Q Wasn't it actually several months after this that you owed them some money after delaying payment that you began to question them?

A No, we realized right from the start we were in an unfortunate predicament.

\*  \*  \*  \*  \*  \*

Q If Mr. Seay's services were not satisfactory back there when you said that they were, why did you continue?

A As I said before, we were in an unfortunate position; we couldn't find anybody to look after our wells. Mr. Seay told me in so many words 'if you don't like the way we are doing it you know what you can do.'

\*  \*  \*  \*  \*  \*

A \* \* \* but the gauge reports will show whether or not there's any production. If there's no production the first thing you look for is to see if the wells are shut down for some reason or another. If the wells are not shut down then there's no explanation for the loss of production, for the nonproduction, then it is up to the pumper. Either he misgauged the tanks or he didn't gauge them or he is putting down a fake gauge.

Q You had all this information, did you not, Mr. Buckley? In your office?

A Yes sir.

Q The number of days shown that they were down here, the number of days according to your record they were not gauged, still you did not come down there to see about it but five or six times, did you not, Mr. Buckley?

A My brother was down here several times. Mr. Hamilton was down quite a bit. Frankly, we were very dissatisfied with the way things were going and that is the reason we were complaining to Mr. Ray Seay.

Q There was somebody down there pretty regularly, is that not true, Mr. Buckley?

A Fairly regularly, yes sir.

Q Was somebody down there fairly regularly and knew what was going on?

A We were pretty much convinced that Mr. Urban Seay was not attending to his business.

Q But you knew about this work that was going on, did you not? There was somebody down there.

A Some of these invoices were a surprise to us because we didn't know it was going on and we had not authorized the work.

Q But you did not actually complain about it until March?

A No sir, I complained about it before.

Q But not to the extent of stopping their reoccurrences of it.

A The answer, as I say, we were placed in an unfortunate position. We could not find anybody to look after our wells and we were stuck."

On March 4, 1964, Mr. Buckley wrote appellee this letter:

"March 4, 1964. C's Lease Service. P O Box 544, Luling, Texas. Gentlemen: In accordance with a telephone conversation of Monday, I am inclosing check in the amount of $500.00 to apply on our account with you. Our accountant has all of your invoices at his office and I have been unable to reach him to determine the exact amount we owe you. As soon as I can get squared away with him I will send you a check for the balance due."

In Waul v. Hardie, 17 Tex. 553, the Court approved this instruction to a jury:

"If a workman is employed to do work, and, from the unskillful manner in which the work is done, damage result to the other party, the workman is responsible for it."

That is the law, is not to be doubted. 56 C.J.S. Master and Servant §§ 77 and 79.

The law is equally well settled that an employer may waive his claim for damages occasioned by his employe.

A case we consider directly in point is Clegg & Co. v. Gee, 2 Willson Civ.Cas.Ct. App. § 543, p. 487, (1885) opinion by Hurt, J. The entire report of the case follows:

"Appellee and appellants entered into a written contract, by the terms of which appellee was to serve appellants as a traveling salesman for $75 per month. It was stipulated in the contract that he should report to them each day by letter, or postal card, 'his location,' and that a failure on his part to do this forfeited his right to any salary that might be due him. Appellee failed to report almost from the commencement of his services to the termination thereof. Appellants knew of this failure, but made no complaint, but on the contrary, after appellee had been in their service a month, and failing to report according to his contract, he visited them at Galveston, and, with a full knowledge of his failure to report, they made no complaint about it, but sent him out again on his travels under the same contract, except that appellee, when starting out this time, informed appellants that he would only write to them when he sent orders. Appellants having refused to pay appellee his salary according to contract, he sued them therefor, and recovered judgment for the amount due him under said contract. Held: Appellants were estopped by their acts from insisting on appellee's breach of the contract, and such estoppel entitled appellee to recover upon the contract."

In Kemerer v. Johnstown Bank and Trust Co., 120 Pa.Super. 173, 182 A. 74, the Court stated the applicable law in these words:

"It was entirely his (employer's) business to determine whether he was obtaining what he wanted from the plaintiff, or even to waive any deficiencies in performance. It is, of course, elementary that a master may waive nonperformance, and that continuance by him of an employee in his service, with knowledge of a breach of the employment contract, constitutes a waiver. 39 C.J. 169. Thus an employee may recover wages, when he is retained in his employment, although he is lazy (Hobbs v. Riddick, 50 N.C. 80), or incompetent (Ferry v. Henderson, 32 App.D.C. 41), or even unfaithful to his trust (Kirk v. Hodgson, 3 Johns. Ch. [N.Y.] 400)."

If appellant is correct in his assumptions of law and fact, these results would follow:

The two wells were at all times capable of making their total allowable of 40 barrels per day. This oil was worth $2.64 per barrel. Appellee produced 8,201 barrels of oil for appellant of a value of $21,650.00. Since appellant could find no one else to service and operate these wells they would have been shut in if appellee had been dis-

charged and appellant would have lost the value of the oil produced. Knowing that appellee was not producing these wells to their capacity, appellant could discharge him with the above consequences or he could permit him to produce $21,650.00 of oil which appellee would otherwise have lost, and then force appellee to pay it $4,802.16 for oil which he failed to produce, less $525.00 service charges. This latter course is the one chosen by appellant.

We follow the just rule of law stated in the above authorities. We hold that appellant was not entitled to recover on its cross action and that the judgment of the trial court should be, and it is, affirmed.

Affirmed.